## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MERION CAPITAL LP and MERION CAPITAL II LP, | ) ) ) | |
| Petitioners, | ) ) | |
| v. | ) ) | C.A. No. 8900-VCG |
| BMC SOFTWARE, INC., | ) ) | |
| Respondent. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: October 7, 2014
Date Decided: January 5, 2015

Steven T. Margolin, Marie M. Degnan, and Phillip R. Sumpter, of ASHBY & GEDDES, Wilmington, Delaware, Attorneys for Petitioners.

Collins J. Seitz, Jr., David E. Ross, and S. Michael Sirkin, of SEITZ ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware;  OF COUNSEL:  Yosef J. Reimer, P.C., Devora W. Allon, and Ryan D. McEnroe, of KIRKLAND & ELLIS LLP, New York, New York, Attorneys for Respondent.

GLASSCOCK, Vice Chancellor

This action, and a similar case in which I am simultaneously issuing a memorandum opinion,[1] concern an interpretation of the standing requirements under the appraisal statute, 8 *Del. C.* § 262, as amended in 2007. The respondent company alleges that the amendment altered those standing requirements, which precludes the petitioning stockholders' standing here. Accordingly, the respondent company seeks summary judgment.

## I. BACKGROUND FACTS

### A. The Merger

This appraisal action stems from a take-private merger between Respondent BMC Software, Inc. ("BMC") and two Delaware corporations formed by a consortium of private equity buyers solely for the purpose of taking BMC private—Boxer Parent Company Inc. and its wholly owned subsidiary Boxer Merger Sub Inc. (collectively, "Boxer").[2] BMC, also a Delaware corporation, is "one of the world's largest software companies," providing "IT management solutions for large, mid-sized, and small enterprises and public sector organizations around the world."[3] On May 6, 2013, BMC and Boxer entered into an Agreement

---

[1] *In re Appraisal of Ancestry.com, Inc.*, C.A. No. 8173-VCG (Del. Ch. Jan. 5, 2015).
[2] Sirkin Aff. Ex. 2, at 19. The buyer group consists of Bain Capital, LLC, Golden Gate Private Equity, Inc., Insight Venture Management, LLC, and Westhorpe Investment Pte Ltd. *Id.*
[3] *Id.*

1

and Plan of Merger (the "Merger Agreement") whereby Boxer was to acquire BMC for $46.25 per share of common stock.[4]

Petitioners Merion Capital LP and Merion Capital II LP (collectively, "Merion") are self-described "event-driven investment" funds,[5] or, in the words of the Respondent, "hedge fund[s] that specialize[] in appraisal arbitrage."[6] "Appraisal arbitrage" is a phrase commonly used to denote an investment strategy whereby an investor acquires an equity position in a cash-out merger target with the specific intention of exercising the statutory stockholder appraisal right found in 8 *Del. C.* § 262; in the subsequent appraisal action the court awards the appraisal petitioners what the court determines to be the fair value of the target, which, if the target was undervalued in the transaction, represents a positive return on the arbitrage investor's initial investment. Pursuant to this investment strategy, Merion determined that the "consideration offered in the [BMC/Boxer] merger . . . [was] considerably below the value of BMC" and began purchasing shares of

---

[4] Sirkin Aff. Ex. 4, at 2. In the months following the execution of the Merger Agreement, BMC and Boxer further negotiated an equity roll-over for a BMC stockholder and a $0.05 increase in merger consideration. *Id.* The parties eventually agreed to the roll-over but not the price increase, and executed that change in Amendment No. 1 to the Merger Agreement. *Id.*

[5] Pet'rs' Answering Br. in Opp'n to Resp't's Mot. for Summ. J. at 6; *see also* Sirkin Aff. Ex. 8, at 15:23–16:8 ("Q. What did [Merion founder] Mr. Barroway tell you about what he envisioned the business of Merion to be? A. He said that . . . they're looking to start an event—he's a former lawyer, and looking to start an event-driven fund and needed someone with analytical capability, merger experience, and that one of those strategies of the fund would be pursuing appraisal rights.").

[6] Opening Br. in Supp. of Resp't's Mot. for Summ. J. at 7.

BMC stock on the public market, through a series of brokers, in July 2013.[7] By July 17, 2013, Merion had acquired 7,629,100 shares of BMC common stock and, as the beneficial owner of those shares, moved to perfect its right under the appraisal statute.[8]

Because only the record holder of shares can make the statutorily required demand for appraisal on the corporation under Section 262,[9] a beneficial owner seeking appraisal must direct the record holder of its shares to make a demand for appraisal on the beneficial owner's behalf.[10] Typically, according to Merion, a beneficial owner would accomplish this by directing an intermediary broker to direct the record holder to issue the demand; in this instance, however, when Merion attempted to direct its broker to pass along its demand request to the record owner of its BMC shares, Cede & Co. ("Cede"), the nominee of the Depository Trust Company ("DTC"), the broker refused, citing a policy change within the

---

[7] Sirkin Aff. Ex. 8, at 23:16–20, 212:20–219:12.

[8] *Id.* at 248:13–252:17.

[9] *See* 8 *Del. C.* § 262(a) ("Any stockholder of a corporation of this State who holds shares of stock on the date of the making of a demand pursuant to subsection (d) of this section with respect to such shares, . . . who has otherwise complied with subsection (d) of this section . . . shall be entitled to an appraisal by the Court of Chancery of the fair value of the stockholder's shares of stock . . . .  As used in this section, the word 'stockholder' means a holder of record of stock in a corporation . . . ."); *id.* § 262(d) ("Each stockholder electing to demand the appraisal of stockholder's shares shall deliver to the corporation, before the taking of the vote on the merger or consolidation, a written demand for appraisal of such stockholder's shares.").

[10] The operation of modern securities practice, including the delineation between beneficial owners and record holders of stock and the ubiquity of central securities depositories like the Depository Trust Company, has been previously chronicled by this Court, and I do not find it necessary to replicate that information here. The reader is referred to former Chancellor Chandler's opinion in *In re Appraisal of Transkaryotic Therapies, Inc.*, 2007 WL 1378345, at *2 (Del. Ch. May 2, 2007), for a thorough discussion of the topic.

broker company.[11]  Merion claims that, as a result, the "unexpected news left [it] with only one path for ensuring that its appraisal demand would be timely submitted—*i.e.*, take the steps necessary to have its holdings in BMC stock withdrawn from the fungible mass at DTC/Cede and registered directly with BMC's transfer agent, Computershare."[12]  In other words, Merion sought to become not only the beneficial owner of its shares but also the record holder, so that Merion itself could make the statutorily required appraisal demand on BMC.[13]  Over the next few days Merion carried out that task, and on July 19, 2013, Computershare confirmed that it had transferred 7,629,100 shares of BMC common stock from the fungible bulk at DTC/Cede to Merion, which now held the shares in record name on its books.[14]  On July 22, 2013, Merion delivered its formal demand for appraisal of those shares to BMC.[15]

On the heels of Merion's appraisal demand, on July 24, 2013, BMC held a special meeting of stockholders to vote on the proposed merger of BMC with and

---

[11] Sirkin Aff. Ex. 8, at 277:4–20.

[12] Pet'rs' Answering Br. in Opp'n to Resp't's Mot. for Summ. J. at 12.  Merion's portfolio manager, Samuel Johnson, explained that Merion itself could not petition DTC/Cede to make the appraisal demand because Merion was not a participant in DTC/Cede, which is why it was required to rely on a broker to communicate with DTC/Cede. *See* Sirkin Aff. Ex. 8, at 278:2–7 ("[A]s a street name beneficial holder of stock, which is what we were at the time, we cannot go directly to Cede & Co. and ask them to sign this [demand] letter.  Only participants in DTC are allowed to interact with DTC or Cede.").

[13] Sirkin Aff. Ex. 8, at 278:11–279:4.

[14] *See* Sirkin Aff. Ex. 10, at 1–2 (stock transfer confirmation).

[15] *See* Sirkin Aff. Ex. 15 (demands for appraisal).

into Boxer.[16]  Holders of BMC common stock as of the June 24, 2013 record date, representing 141,454,283 shares, approved the merger by over a two-thirds vote: 95,033,127 shares were voted for adopting the Merger Agreement while 46,421,156 shares were not voted for adopting the Merger Agreement.[17] Subsequently, the take-private merger between Boxer and BMC closed on September 10, 2013 with each share of BMC being converted into a right to receive $46.25 in cash.[18]

*B. Procedural History*

On September 13, 2013, Merion commenced this action by filing its Verified Petition for Appraisal of Stock.  In that Petition, Merion represented that it "did not vote [its 7,629,100 shares of BMC] in favor of the Merger, [has] not sought to exchange [those shares] for payment from BMC Software in connection with the Merger, and [has] not withdrawn [its] demand for appraisal of [those shares]."[19] Following stipulated discovery between the parties, BMC filed its Motion for Summary Judgment on July 28, 2014.  I heard oral argument on this Motion in court on October 7, 2014.

---

[16] Sirkin Aff. Ex. 2, at 21.
[17] Sirkin Aff. Ex. 4, at 4.  A majority vote was required for BMC to adopt the Merger Agreement.  Sirkin Aff. Ex. 2, at 22.
[18] Sirkin Aff. Ex. 5, at 2.
[19] Pet. for Appraisal ¶ 5.

*C. The Parties' Contentions*

The narrow legal issue before this Court arises out of the specific factual circumstances surrounding Merion's appraisal demand. Under the statute, had Merion simply been successful in getting its original record holder Cede to make the appraisal demand, Merion would have proper standing to file its appraisal action.[20] However, because Merion withdrew its BMC shares from DTC/Cede and itself became the record holder demanding appraisal, BMC claims Merion can no longer satisfy the statute's standing requirements. In support of that contention, BMC argues that Section 262 only permits the appraisal of shares not voted in favor of the merger and that, consequently, Merion, as the record holder, bears the burden of proving that *each share* it seeks to have appraised was not voted by any previous owner in favor of the merger—a burden, if it exists, that Merion concededly has not met.[21] Conversely, Merion argues that no such burden exists in Section 262 and, in fact, has been previously rejected by this Court. Rather,

---

[20] *See* 8 *Del. C.* § 262(a); *infra* note 49; *In re Appraisal of Ancestry.com, Inc.*, C.A. No. 8173-VCG, at 12–14 (Del. Ch. Jan. 5, 2015) (finding that *Transkaryotic* remains in force to permit a record holder to perfect appraisal rights for beneficial owners as long as the record holder holds sufficient shares in fungible bulk not voted in favor of the merger to cover the number of shares for which the beneficial owner seeks to have appraised).

[21] Johnson explained in his deposition that, because Merion purchased its shares on the open market, it cannot identify the entities from which it purchased its shares. Sirkin Aff. Ex. 8, at 216:11–14. In addition, because Merion's shares were transferred from the "fungible mass at DTC/Cede," Merion is not able to say how the specific shares it came to hold on record were voted in the transaction; nor did Merion take any additional steps to ensure that those shares were not voted in favor of the merger, such as acquiring proxies from the prior owners of the shares. *Id.* at 217:15–219:12.

6

Merion argues that, under the appraisal statute, it is only required to show that *it* has not voted the shares for which it seeks appraisal in favor of the merger—a standard that Merion concededly has met.

### 1. The Appraisal Statute

In Section 262 of the Delaware General Corporation Law, the Delaware General Assembly has granted stockholders appraisal rights in certain transactions—including, relevantly here, cash-out mergers—so long as the standing requirements of the statute are met. Those requirements are set forth in Section 262(a), which provides that:

> Any stockholder of a corporation of this State who holds shares of stock on the date of the making of a demand pursuant to subsection (d) of this section with respect to such shares, who continuously holds such shares through the effective date of the merger or consolidation, who has otherwise complied with subsection (d) of this section and who has neither voted in favor of the merger or consolidation nor consented thereto in writing pursuant to § 228 of this title shall be entitled to an appraisal by the Court of Chancery of the fair value of the stockholder's shares of stock under the circumstances described in subsection (b) and (c) of this section. As used in this section, the word "stockholder" means a holder of record of stock in a corporation . . . .[22]

Thus, in order for a petitioner to perfect the appraisal remedy according to the plain language of Section 262(a), the petitioner need only show that the *record holder* of the stock for which appraisal is sought: (1) held those shares on the date it made a statutorily compliant demand for appraisal on the corporation; (2) continuously

---

[22] 8 *Del C.* § 262(a).

held those shares through the effective date of the merger; (3) has otherwise complied with subsection (d) of the statute, concerning the form and timeliness of the appraisal demand; and (4) has not voted in favor of or consented to the merger with regard to those shares.[23]

Noticeably absent from this language, or any language in the statute, is an explicit requirement that the stockholder seeking appraisal prove that the *specific shares* it seeks to have appraised were not voted in favor of the merger. Regardless, BMC argues that this Court should find such a share-tracing requirement[24] implicit in the statute's requirements, considering the overall purpose of Section 262, references in other subsections of the statute to how specific shares were voted, and the policy concern that, without a share-tracing requirement, stockholders could have purchased shares voted by their predecessors in favor of the merger, resulting in a theoretical possibility that appraisal could be sought for more shares than actually dissented in the merger vote.

---

[23] BMC conceded at oral argument that where Section 262(a) refers to a stockholder "who has neither voted in favor of the merger or consolidation nor consented thereto in writing," the statute means the stockholder has not voted in favor of the merger or consented to it with respect to the shares it seeks to have appraised. *See* Oral Arg. Tr. 12:13–17 ("THE COURT: Well, when it says the stockholder voted, I assume that we all agree that the statute means with respect to those shares. MR. REIMER: And I think it means with respect to those shares.").

[24] I use the term "share-tracing requirement" as a shorthand for the burden that BMC suggests the statute imposes on appraisal petitioners; it is somewhat imprecise, as BMC suggests that the petitioner could meet the burden in a number of ways, some of which do not involve tracing—speaking strictly—the voting history of a particular share, such as a post record-date purchaser of shares purchasing sufficient proxies to cover the number of shares for which it seeks appraisal. *See infra* note 53.

According to BMC, the legislative purpose behind Section 262 favors an interpretation of the statute that includes a share-tracing requirement. Citing the appraisal statute's origin as a reaction to the common-law rule whereby a single dissenting stockholder could prevent a merger,[25] BMC explains that "Section 262 represents 'a limited legislative remedy . . . intended to provide shareholders, who dissent from a merger asserting the inadequacy of the offering price, with an independent judicial determination of the fair value of their shares.'"[26] From this genesis, BMC extrapolates that it was always the General Assembly's intent that "only shares that did not vote in favor of the merger [be] eligible for appraisal under the language of Section 262."[27]

As further proof of an implicit share-tracing requirement, BMC points to Section 262(e), as amended in 2007, which provides that:

> Within 120 days after the effective date of the merger or consolidation, any stockholder who has complied with the requirements of subsections (a) and (d) of this section hereof, upon written request, shall be entitled to receive from the corporation surviving the merger or resulting from the consolidation a statement setting forth the aggregate number of shares not voted in favor of the merger or consolidation and with respect to which demands for appraisal have been received and the aggregate number of holders of such shares.[28]

---

[25] For a brief history of the appraisal statute, see *In re Appraisal of Ancestry.com, Inc.*, C.A. No. 8173-VCG, at 6–9 (Del. Ch. Jan. 5, 2015).

[26] Opening Br. in Supp. of Resp't's Mot. for Summ. J. at 14 (quoting *Ala. By-Products Corp. v. Neal*, 588 A.2d 255, 256 (Del. 1991)).

[27] *Id.* at 15.

[28] 8 *Del. C.* § 262(e).

BMC concedes that subsection (e) is designed to be an informational tool "to permit dissenting stockholders 'to learn how many shares might qualify for appraisal,'" so that these dissenting stockholders might share the costs of the appraisal action.[29] Nonetheless, BMC argues that the reference in this subsection specifically to "shares not voted in favor of the merger or consolidation and with respect to which demands for appraisal have been received" indicates the General Assembly's intent that appraisal only be available for shares that can be shown to have not been voted in favor of the merger. In other words, BMC asks this Court to interpret the requirements of subsection (a) in light of the reference to specific shares in subsection (e), such that "not only does an appraisal petitioner carry the burden of showing that it 'did not vote in favor of the merger,' § 262(a), it also must show the shares for which it seeks appraisal are 'shares not voted in favor of the merger,' § 262(e)."[30] Any other interpretation of the statute, BMC argues, would not give effect to the statute's purpose or all of its provisions, and, specifically, would frustrate the informational goal of subsection (e).[31]

---

[29] Opening Br. in Supp. of Resp't's Mot. for Summ. J. at 15 (quoting H.R. 16, 131st Gen. Assembly 11, 63 Del. Laws c. 25, § 14 (Del. 1981) (legislative synopsis)); *see also* Oral Arg. Tr. 5:21–6:3 ("[Subsection] (e) talks about there having—there needing to be—the information that can be obtained, which, of course, the legislature tells us is in order for the party seeking appraisal to know with whom they can share the costs and so on, is to let them know how many shares might qualify for appraisal is the legislative purpose.").

[30] Opening Br. in Supp. of Resp't's Mot. for Summ. J. at 15–16.

[31] *See id.* at 16 ("If any stockholder who did not itself vote in favor of the merger could seek appraisal for the shares it held at closing, without regard to how those shares were voted, then Section 262(e)'s statement of shares requirement would be entirely superfluous, as it would not

10

Finally, BMC argues that policy concerns dictate that this Court find an implicit share-tracing requirement in Section 262:

> [I]f an appraisal petitioner need only demonstrate that it did not vote in favor of the merger itself, . . . nothing would prevent a majority, or even all of a corporation's shares from seeking appraisal, notwithstanding the fact that for a transaction to have been approved, at least a majority of the shares would have had to have been voted in favor of it.[32]

Theoretically, BMC points out, absent a share-tracing requirement "an appraisal arbitrageur, like Merion, [could] purchase[] most or all of a corporation's shares after the record date without securing proxies or revocations of proxies, and then [seek] appraisal for those shares even though the record-date holder voted them for the merger."[33] Considering the purpose of Section 262 "to provide a remedy to minority stockholders who dissented from the merger," such a possible outcome would be absurd, BMC argues, and must be precluded by construing the statute so that "only shares not voted in favor of a merger are eligible for appraisal."[34]

2. The Teachings of *Transkaryotic*

This case is not the first time this Court has visited the conflicts that arise when the alleged intent of the appraisal statute collides with the realities of modern securities practice. In 2007, then-Chancellor Chandler considered a similar, but

---

show 'how many shares might qualify for appraisal.'" (quoting *Cordero v. Gulfstream Dev. Corp.*, 56 A.3d 1030, 1035–36 (Del. 2012))).

[32] *Id.* at 16–17.

[33] *Id.* at 17.

[34] *Id.*

factually distinct, situation in *In re Appraisal of Transkaryotic Therapies, Inc.*[35] In *Transkaryotic*, the record holder of stock, Cede, petitioned for appraisal on behalf of a group of beneficial owners for over ten million shares of a merger target, including over eight million shares that the beneficial owners had acquired after the record date but before the effective date of the merger.[36] On a motion for partial summary judgment, the Court considered whether "a beneficial shareholder, who purchased shares *after* the record date but before the merger vote, [must] prove, by documentation that each newly acquired share (*i.e.*, after the record date) is a share not voted in favor of the merger by the *previous* beneficial shareholder."[37] Relying on the plain language of Section 262, as it existed at the time, the Court answered in the negative, determining that since "only a record holder . . . may claim and perfect appraisal rights," "it necessarily follows that the record holder's actions determine perfection of the right to seek appraisal."[38] Since Cede held over 16 million shares that it did not vote in favor of the merger, the Court concluded that Cede could, and did, perfect appraisal rights for all of the beneficial owners' 10 million shares.[39]

---

[35] 2007 WL 1378345 (Del. Ch. May 2, 2007).
[36] *Id.* at *1.
[37] *Id.* at *3.
[38] *Id.*
[39] *Id.* at *4.

In the wake of *Transkaryotic*, the General Assembly amended Section 262 to explicitly allow beneficial owners to directly file petitions for appraisal,[40] potentially raising questions about the continuing impact of the case.[41] Despite this fact, and despite that *Transkaryotic* is factually distinct from this case, both Merion and BMC argue that *Transkaryotic* supports their diametric positions. Merion highlights that the *Transkaryotic* decision rejected imposing a share-tracing requirement on Section 262 and underscores the Court's discussion, en route to that holding, of the difficulties of tracing votes to specific shares due to the reality of modern securities practice, where most securities are "held in an undifferentiated manner known as 'fungible bulk'" on deposit at central securities depositories, such as DTC.[42] Conversely, BMC emphasizes the Court's reliance in its holding on Cede's ability to prove it held an amount of shares that had not been voted in favor of the merger greater than the amount being sought for appraisal, claiming this as proof that under *Transkaryotic,* "at a minimum, record holders like Merion bear the burden to show that the shares they seek to have appraised were not voted in favor of the merger."[43]

---

[40] *See* 8 *Del. C.* § 262(e) ("Notwithstanding subsection (a) of this section, a person who is the beneficial owner of shares of such stock held either in a voting trust or by a nominee on behalf of such person may, in such person's own name, file a petition or request from the corporation the statement described in this subsection.").

[41] *But see infra* note 49.

[42] *Transkaryotic*, 2007 WL 1378345, at *2.

[43] Opening Br. in Supp. of Resp't's Mot. for Summ. J. at 22.

## II. STANDARD OF REVIEW

Summary judgment is appropriate only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[44] In making that determination, the court must "view the facts in the light most favorable to the nonmoving party, and the moving party has the burden of demonstrating that there is no material question of fact."[45] The parties have agreed that there is no dispute as to the material facts of the case, and so the only issue that remains is whether, as a matter of law, Merion has met the statutory requirements of Section 262.

## III. ANALYSIS

Merion is an arbitrageur which seeks to capitalize on what it perceives to be an undervalued transaction. Section 262 permits the existence of appraisal arbitrage by allowing investors to petition for appraisal of stock purchased after a merger is announced.[46] The parties dispute whether the arbitrageur here has fully

---

[44] Ch. Ct. R. 56(c).

[45] *E.g.*, *Transkaryotic*, 2007 WL 137835, at *3 (quoting *Elite Cleaning Co. v. Walter Capel and Artesian Water Co.*, 2006 WL 1565161, at *3 (Del Ch. June 2, 2006)).

[46] *See* 8 *Del. C.* § 262(a) ("Any stockholder of a corporation of this State who holds shares of stock *on the date of the making of a demand* pursuant to subsection (d) of this section with respect to such shares, who continuously holds such shares *through the effective date of the merger or consolidation* . . . shall be entitled to an appraisal by the Court of Chancery of the fair value of the stockholder's shares of stock . . . ." (emphasis added)); *cf. Transkaryotic*, 2007 WL 137835, at *5 ("Respondents raise one policy concern that deserves mentioning. They argue that this decision will 'pervert the goals of the appraisal statute by allowing it to be used as an

14

perfected its right to appraisal under the statute. Specifically, BMC asks this Court to determine whether Section 262 requires Merion to demonstrate that each share it seeks to have appraised is a share that was never voted in favor of the merger, not just by itself, but by any owner. Because I find that the unambiguous language of the statute does not give rise to any such share-tracing requirement, and that Merion has otherwise complied with the requirements of Section 262, I hold that Merion has perfected its right to appraisal.

### A. The Standing Requirements of Section 262

As mentioned above, in order to properly perfect the appraisal remedy under the plain language of Section 262(a), a petitioner need only show that the record holder of the stock for which appraisal is sought: (1) "[held such] shares of stock on the date of the making of a demand pursuant to subsection (d) of this section with respect to such shares;" (2) "continuously [held] such shares through the effective date of the merger or consolidation;" (3) "has otherwise complied with subsection (d) of this section;" and (4) "has neither voted [such shares] in favor of the merger or consolidation nor consented thereto in writing."[47] The statute's requirements are directed to the *stockholder*—expressly defined as the *record*

---

investment tool for arbitrageurs as opposed to a statutory safety net for objecting stockholders.' That is, the result I reach here may, argue respondents, encourage appraisal litigation initiated by arbitrageurs who buy into appraisal suits by free-riding on Cede's votes on behalf of other beneficial holders—a disfavored outcome. To the extent that this concern has validity, relief more properly lies with the Legislature. Section 262, as currently drafted, dictates the conclusion reached here." (footnotes omitted)).

[47] 8 *Del. C.* § 262(a).

*holder*—and whether *it* has owned the stock at the appropriate times, whether *it* has made a sufficient demand, and whether *it* has voted the shares it seeks to have appraised in favor of the merger. My interpretation of Section 262(a) as clear in that regard is consistent with *Transkaryotic*. In that case, then-Chancellor Chandler determined that Cede did not have to demonstrate that each individual share it sought to have appraised was a share it did not vote in favor of the merger, but was only required to show that it held a quantity of shares it had not voted in favor of the merger equal to or greater than the quantity of shares for which it sought appraisal.[48] The Court's focus was on the *petitioner/record holder*, not on the *shares*—in other words, on whether Cede had sufficient shares it had not voted in favor of the merger to satisfy the demand, not whether those specific shares were shares Cede had voted in favor of the merger.[49]

---

[48] *See Transkaryotic*, 2007 WL 137835, at *4 ("It is uncontested that Cede voted 12,882,200 shares in favor of the merger and 16,838,074 against, abstained, or not voted in connection with the merger. It is further uncontested that Cede otherwise properly perfected appraisal rights as to all of the 10,972,650 shares that petitioners own and for which appraisal is now sought. Thus, because the actions of the beneficial holders are irrelevant in appraisal matters, the inquiry ends here. Cede, the record holder, properly perfected appraisal rights under §262. As a result, Cede may exercise appraisal rights for all 10,972,650 contested shares.").

[49] This principle is unaffected by the post-*Transkaryotic* amendment to Section 262(e) granting beneficial owners the right to file appraisal petitions and receive a report of appraisal shares. In making this amendment, the General Assembly left the standing requirements of Section 262(a) entirely untouched, including notably the statute's definition of "stockholder" as "a holder of record." 8 *Del. C.* § 262(a). Therefore, although procedurally a beneficial owner may now initiate the legal action, its substantive right to appraisal is still dependent on whether the record holder has perfected appraisal according to Section 262(a). For a more in-depth discussion of the status of *Transkaryotic* following the 2007 amendment, see *In re Appraisal of Ancestry.com, Inc.*, C.A. No. 8173-VCG, at 12–14 (Del. Ch. Jan. 5, 2015).

16

Contrary to BMC's position, the meaning of the unambiguous language in Section 262(a) does not change in light of a reading of Section 262(e), such that the two subsections together imply a limitation that only shares not voted in favor of the merger are eligible for appraisal and, consequently, a requirement that the petitioner must identify how each share was voted. Subsection (e) of the appraisal statute exists to aid those seeking appraisal by, among other things, providing similarly situated petitioners with information that may aid in pooling resources and granting beneficial owners the ability to file appraisal actions. It is antithetical to that intention to interpret the language of subsection (e) to impose, on the statute as a whole, an additional hurdle for appraisal petitioners; rather, the effect of the language in subsection (e) referencing how individual shares were voted is necessarily limited to defining the scope of the petitioner's informational right, in which that language is found. It is true, as BMC argues, that the language chosen by the General Assembly may theoretically be ineffective, in light of appraisal arbitrage, in facilitating disclosure of the total number of shares for which appraisal is sought. At most, this fact indicates that the General Assembly may not have picked a fail-safe method to achieve its goals; it may not have fully considered the theoretical possibility that shares acquired after the record date not voted in favor of the merger by the acquirer may nonetheless have been so voted by the seller, leading, hypothetically, to the number of shares for which appraisal is sought

exceeding the number not voted for the merger. This fact does *not* show that the General Assembly meant to impose an additional standing requirement for appraisal petitioners, let alone one that is contrary to the plain language of Section 262(a). Had the General Assembly intended the statute to include a share-tracing requirement, I conclude it would have explicitly written that requirement into the provision governing standing, subsection (a), rather than utilizing the backhanded method of introducing language in subsection (e)—a portion of the statute meant to enhance, not limit, rights to appraisal.[50]

Finally, I do not consider it appropriate to weigh the public policy concern raised by BMC, namely that a failure of this Court to read a share-tracing requirement into the statute could allow "a majority, or even all of a corporation's shares from seeking appraisal, notwithstanding the fact that for a transaction to have been approved, at least a majority of the shares would have had to have been voted in favor of it."[51] It is undisputed that such a situation is not present here: Merion has sought appraisal for 7,629,100 shares stemming from a transaction where 95,033,127 of the total 141,454,283 voting shares voted to approve the merger.[52] As a member of the judicial branch, it is inappropriate for me to

---

[50] *See Giuricich v. Emtrol Corp.*, 449 A.2d 232, 238 (Del. 1982) ("[W]here a provision is expressly included in one section of a statute, but is omitted from another, it is reasonable to assume that the Legislature was aware of the omission and intended it. The courts may not engraft upon a statute language which has been clearly excluded therefrom by the Legislature.").

[51] Opening Br. in Supp. of Resp't's Mot. for Summ. J. at 16–17.

[52] Sirkin Aff. Ex. 4, at 4.

18

presume to rewrite an unambiguous statute to address a problem that has not occurred, may not occur, and, in any event, is certainly not before me now.[53] It may be true that the plain language of Section 262 does not adequately serve all the purposes of that statute. It is possible that appraisal arbitrage itself leads to unwholesome litigation.[54] However, in evaluating my role in alleviating these

---

[53] *See, e.g.*, *In re Adoption of Swanson*, 623 A.2d 1095, 1099 (Del. 1993) ("It is beyond the province of courts to question the policy or wisdom of an otherwise valid law. Instead, each judge must take and apply the law as they find it, leaving any changes to the duly elected representatives of the people." (internal citation omitted)); *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 80 A.3d 155, 160 (Del. Ch. 2013) ("[A]s has long been recognized by the Delaware Courts, when the General Assembly has addressed an issue within its authority with clarity, there is no policy gap for the court to fill. If a valid statute is not ambiguous, the court will apply the plain meaning of the statutory language to the facts before it. It would usurp the authority of our elected branches for this court to create a judicial exception to the words 'all . . . privileges' for pre-merger attorney-client communications regarding the merger negotiations. That sort of micro-surgery on a clear statute is not an appropriate act for a court to take." (internal footnotes omitted)). Even assuming, *arguendo*, that the "over-appraisal" concern was before me in this case and I found it necessary to fix that problem, I would still be unclear as to the practical framework of the solution. BMC generally argues for a share-tracing requirement that would allow only shares not voted in favor of the merger to be appraised, but BMC does not champion any specific requirement; rather, BMC suggests that an appraisal arbitrageur could satisfy this general burden in various ways, such as by purchasing its shares prior to the record date and itself voting the shares, or by securing proxies or revocations of proxies for shares acquired after the record date. Opening Br. in Supp. of Resp't's Mot. for Summ. J. at 26–27. The fact that multiple avenues exist to remedy what Merion sees as a problem with the statute—none of which have been vetted by the General Assembly—further illustrates that BMC's concern requires legislative, not judicial, deliberation.

[54] *But see* Minor Myers & Charles R. Korsmo, *Appraisal Arbitrage & the Future of Public Company M&A*, 92 Wash. U. L. Rev. (forthcoming 2015), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2424935 (arguing that the recent rapid growth in appraisal arbitrage should be welcomed as a benefit to stockholders and corporate law generally, because empirical evidence suggests "appraisal arbitrage focuses private enforcement resources on the transactions that are most likely to deserve scrutiny, and the benefits of this kind of appraisal accrue to minority shareholders even when they do not themselves seek appraisal"); George S. Geis, *An Appraisal Puzzle*, 105 Nw. U. L. Rev. 1635, 1661–77 (2011) (suggesting that expanded appraisal rights could serve as a "back-end market check on controller abuses," whereby, "if the controller hopes to expropriate value from minority shareholders through a cut-rate offer, outside investors will have incentives to purchase the shares and seek appraisal under

concerns through the adjudication of this case, I find former Chancellor Chandler's words in *Transkaryotic*—wherein over seven years ago he considered whether his decision would "pervert the goals of the appraisal statute by allowing it to be used as an investment tool for arbitrageurs"—to be particularly apposite:

> To the extent that [these] concern[s] ha[ve] validity, relief more properly lies with the Legislature. Section 262, as currently drafted, dictates the conclusion reached here. . . . The Legislature, not this Court, possesses the power to modify § 262 to avoid the evil[s], if [they are] evil[s], that purportedly concern[] [the Respondent].[55]

*B. Application of Standing Requirements*

Having not found any implicit share-tracing requirement present in the statute, I turn to the four explicit standing requirements set forth in Section 262(a). It is undisputed that Merion has satisfied all of these requirements. Merion made a written demand for appraisal of 7,629,100 shares of BMC common stock on July 22, 2013, at which time it held all shares for which it sought appraisal. The appraisal demand Merion delivered to BMC was timely and sufficiently informative. After delivering its demand for appraisal of the 7,629,100 shares of BMC common stock that it owned, Merion continued to hold those shares throughout the date that the merger of BMC into Boxer became effective, on September 10, 2013. Finally, at no point did Merion ever vote any of the shares

_____

*Transkaryotic*," but arguing that, in order to curb meritless litigation, the appraisal statute should be amended to include an embedded put option).

[55] *In re Appraisal of Transkaryotic Therapies, Inc.*, 2007 WL 137835, at *5 (Del. Ch. May 2, 2007).

20

for which it seeks appraisal in favor of the BMC/Boxer merger. Consequently, Merion has perfected its right to have its 7,629,100 shares of BMC common stock appraised by this Court.

## IV. CONCLUSION

For the foregoing reasons, BMC's Motion for Summary Judgment is denied. An appropriate order accompanies this Opinion.

21

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

MERION CAPITAL LP and MERION )
CAPITAL II LP, )
                                     )
                Petitioners, )
                                     )
       v. )  C.A. No. 8900-VCG
                                     )
BMC SOFTWARE, INC., )
                                     )
                Respondent. )
                                     )

## **ORDER**

AND NOW, this 5th day of January, 2015,

The Court having considered the Respondent's Motion for Summary Judgment, and for the reasons set forth in the Memorandum Opinion dated January 5, 2015, IT IS HEREBY ORDERED that the Respondent's Motion is DENIED.

SO ORDERED:


                                     /s/ Sam Glasscock III
                                     Vice Chancellor